Louis Groh and Estate of Freida Groh, Deceased, Norman D. Groh, Administrator v. Commissioner. Norman D. Groh v. Commissioner.
Groh v. Commissioner
Docket Nos. 51944, 51945.
United States Tax Court
T.C. Memo 1956-108; 1956 Tax Ct. Memo LEXIS 187; 15 T.C.M. (CCH) 538; T.C.M. (RIA) 56108; May 3, 1956
*187 1. Louis Groh, who had for many years operated a country store, dealt in grain, and engaged in trucking in a small community, decided to take his son into the business as a "share-basis joint venture." The written agreement, which a local lawyer prepared to evidence this arrangement, did not employ the term "partnership" and referred to the parties by the descriptive terms "employer" and "employee." Thereafter, the business was carried on jointly by the father and son under the name of Louis Groh & Son, and the bank account on which both issued business checks was maintained in the same name. The son considered that he and his father had entered into a joint venture, and that he was a partner therein; he assumed a major portion of the responsibility and management; and he received 25 per cent of the net profits, plus a $50 per week drawing account. The father made no decision without consulting the son, and considered him to be just as much a part of the business as he was. Held, that a true joint venture or partnership existed between the father and son; and that the net profit of the business is taxable on a partnership basis. 2. Further held, that in each of the cases, an addition *188 to the tax should be imposed under section 294(d)(2) of the Internal Revenue Code (1939), for substantial underestimate of estimated tax resulting from the failure to file a declaration of estimated tax; but that a further addition to the tax should not be imposed under section 294(d)(1)(A) for failure to file the declaration, because such failure was due to reasonable cause and not a willful neglect. R. Carter Scott, Jr., Esq., Travelers Building, Richmond, Va., and Ray R. Shepherd, C.P.A., for the petitioners. Elmer E. Lyons, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: These cases, which were heard together, involve a deficiency in income tax for the year 1950 determined in Docket No. 51944, and also additions to the taxes for *189 said year, determined in both cases, for failure to file declarations of estimated tax and for substantial underestimates of estimated tax, as follows: Addition to Tax
Docket
Section
Section
No.
Petitioner
Deficiency
294(d)(1)(A)
294(d)(2)
51944
Louis Groh and Freida Groh *
$37,326.42
$11,815.26
$7,089.16
51945
Norman D. Groh
2,378.02
1,463.40
The issues for decision are: 1. Whether the business which Louis Groh and his son carried on under their joint names, and in which they shared the responsibilities and management, and divided the profits on an agreed basis, constituted a joint venture or partnership for income tax purposes; or whether all the net profits of such business should be included in the gross *190 income of the father, without any deduction or adjustment for the share thereof which was paid to the son. 2. Whether, in each of the cases, additions to the tax should be imposed both under section 294(d)(1)(A) for failure to file a declaration of estimated tax, and under section 294(d)(2) for substantial underestimate of estimated tax. Findings of Fact Louis Groh and Freida Groh, now deceased, were husband and wife; and Norman D. Groh is their son. Louis and Freida filed a joint income tax return for the year 1950 with the collector of internal revenue at Richmond, Virginia; and Norman filed an individual income tax return for said year with the same collector. Louis, the father, had for many years prior to 1950 carried on various business activities in Clay Bank, a small community in Gloucester County, Virginia. He operated a country store, engaged in trucking, and dealt in grains and seeds which he bought principally from farmers. His son Norman, from the time he was about 10 years of age until he entered college, assisted his father on a part-time basis. At the beginning of the year 1949, Norman became disturbed about the one-man basis on which the expanding grain operations *191 were being handled, about the large amounts owing to banks, and about the the serious difficulties which would arise if anything should happen to his father, so he withdrew from college, against his parent's wishes, and began to work full time in the business. During the first year, which his father regarded as a trial period to see whether he would stay with the business, he received compensation of $35 per week. In the latter part of 1949, Norman became increasingly disturbed and dissatisfied. He wanted to change the one-man organization, to modernize the business, and to obtain an interest therein for himself. His father had promised him at the time he left college that, if he proved satisfactory after a trial period, he would be given an interest in the business under which he would receive 25 per cent of the profits; and that, after he had married, his interest would be increased to 50 per cent. He told his father that he would not continue under the existing arrangement. Louis had intended that the business would eventually be turned over to Norman, who was his only son, after the latter had shown a willingness to assume the responsibilities. So, with this in mind and also *192 with the intention of fulfilling his promise, he discussed the matter with Judge Jones of Clay Bank, who was an attorney at law and also the trial justice for Gloucester County. He told Judge Jones that he would like to have a written agreement prepared which would reflect the abovementioned oral arrangement with his son. He said that during the year he had undertaken to acquaint Norman with the business and to relieve himself of part of the responsibilities; but that Norman had become very dissatisfied; that he thought his son was now ready; and that he had decided to take him into the business under an arrangement whereby Norman would receive 25 per cent of the profits in a "share-basis joint venture beginning the following year." The agreement which Judge Jones prepared was as follows: "THIS AGREEMENT made this 1st day of Jan. 1950, between LOUIS GROH, hereinafter called the Employer; and NORMAN D. GROH, hereinafter called the Employee. "WITNESSETH: That "WHEREAS the said Louis Groh has for a number of years been operating a general seed and grain business, together with a mercantile business at Clay Bank Post Office in Gloucester County, Virginia, all of which being owned *193 exclusively by the said Louis Groh; and "WHEREAS the operation of the trucking and hauling business in connection therewith has been by said Louis Groh turned over to the said Norman D. Groh under an agreement by which the profits therefrom accrue to the said Norman D. Groh as his compensation therefor; and "WHEREAS the said Louis Groh now desires to employ the said Norman D. Groh as an assistant to help and aid him in the general conduct and operation of the said seed and grain business and the said store business and desires to pay to the said Norman D. Groh in manner hereinafter set out. "NOW, THEREFORE, the parties hereto agree as follows: "1. That the said Norman D. Groh shall continue to operate the said trucking business in such manner as to gain the most profit therefrom; and the said Norman D. Groh shall in addition thereto assist the said Louis Groh in the operation and conduct of the said seed and grain business and store business in such manner and perform such duties in connection therewith as the said Louis Groh, his employer, may direct. "2. The said Louis Groh, the said Employer, agrees to pay to the said Norman D. Groh a sum of money annually during the life *194 of this contract as shall equal to a one-fourth of the net profits from the said seed and grain business and store business, but the said sums to be paid by the said Employer to the said Employee shall reflect the profit or loss from the said trucking business. That is to say should the said trucking business show a profit at the end of the year, an amount equal to the said profit shall be deducted from the said one-fourth of the net profits of the said seed and grain business and store business and the remainder paid to the said Norman D. Groh in full for his services, and should the said trucking business show a loss at the end of the year the amount to be paid to the said Norman D. Groh hereunder shall be the sum of the said loss and a one-fourth of the net profits of the said seed and grain business and store business. "This contract shall continue indefinitely, but either party may terminate the same by giving to the other party six (6) months notice. "Executed at Clay Bank, Virginia, in duplicate, on the day and year first above written. "/s/ Louis Groh /s/ Norman D. Groh" The above agreement was signed by Louis and Norman on about January 1, 1950. Neither Judge Jones *195 nor either of the parties had any thought that a tax question would arise. They believed the agreement to be legally sound; it was referred to as a "partnership agreement"; and it was subsequently renewed after Norman's interest in the business was increased. Throughout the year 1950, the father and son carried on the business together, under the name of Louis Groh & Son. Norman assumed a major part of the responsibilities, worked full time and long hours, and gained the confidence of farmers from whom purchases of grain were made. A bank account, separate from those of the father and the son, was maintained in the name of Louis Groh & Son; and in respect to this, Norman made deposits of business funds, and issued numerous checks for business purposes. He supervised the employed personnel. He entered into contracts for the purchase and sale of grain without consultation with his father. Also, he replaced the obsolete grain elevator which his father had been using, after making an extensive examination of elevators in various states; and he gave all the orders incident to building the new structure at a cost of $150,000. The business grew rapidly. Louis recognized that Norman had, *196 and was exercising, complete authority to handle the expanding grain operations without consulting him. He considered his son to be indispensable to the business; and he made no decision without first consulting him. He believed his son's authority was the same as his; and he regarded him to be "just as much a part of that business as I was." Likewise, Norman considered that he and his father had entered into a "joint venture," and that he was a "partner" therein. In addition to the share of the profits which he was to get at the end of the year, he currently received $50 per week which he regarded to be his drawing account. In January 1951, Norman was drafted into the Army; and he continued to serve until December 1952. During the first part of this period he was stationed at a camp located only about 60 miles from his home, and he spent his weekends assisting his father with the business affairs. Later, when he was transferred to Army service in Germany, he gave his father a general power-of-attorney to act for him. After discharge from the Army, he again devoted full time to the business; and his participation in the profits was increased to 33 1/3 per cent. At the close of *197 the year 1950, a certified public accountant, Ray R. Shepherd, undertook to audit the accounts, compute the profits which required the use of inventories, determine the respective share of the father and son, and prepare income tax returns for both. He, however, was overwhelmed with work; so arrangements were made with the Virginia collector for extensions of time to April 15, 1951, within which to file the returns. The audit was not completed until about April 9, 1951. Thereupon, the 1950 net profits of the business were determined, and Norman's 25 per cent share thereof, in the amount of $48,757.62, was credited to his personal account; and on April 13 and 14, 1951, two checks totaling $49,517.62 (representing his said share of the profits, plus $760 representing his proceeds from the sale of certain grain futures) were received by Norman and deposited in his personal bank account. Subsequently, on May 31, 1951, Norman loaned $20,000 of said amount to Louis Groh & Son on a promissory note, for use in the business. In 1950 profits were larger than either Louis or Norman had anticipated at the beginning of the year; and they also were larger than the profits of any previous year. *198 Neither the total profits nor the respective shares of Louis and Norman were determinable until after the audit had been completed on about April 9, 1951. On April 16, 1951, Norman filed his individual income tax return for 1950; and on the same date, Louis and his wife filed a joint return. The tax liabilities shown on each of these returns, together with the interest accrued by reason of the late filings, were paid. Norman, in his return, reported the $2,600 received through his $50 per week drawing account as wages, and showed $300.60 income tax withheld thereon; but, in the same schedule, he also reported his 25 per cent share of the profits, without showing any income tax withholding thereon. On the other hand, Louis and his wife reported, as partnership income, the entire net profits of the trucking division of the business, without showing any distributive shares; and then, after including Norman's 25 per cent share of the profits among the business deductions, they reported the balance as income to them. Neither Louis and his wife, Freida, nor Norman, filed a declaration of estimated tax for the year 1950. Their failure to file such declarations was due to reasonable cause *199 and not to willful neglect. Opinion ti. The first question for decision is whether all the 1950 profits of the business operated under the name of Louis Groh & Son should be included in the gross income of the father, Louis Groh, without deduction or adjustment for the 25 per cent share of such profits paid to the son. Respondent contends that this question should be answered in the affirmative. His position is that the business was a proprietorship of the father, and that the son was merely an employee; that the father reported his income on the accrual basis, but that the son must be regarded as having been on the cash basis, since he possessed no separate books and had reported his $35 per week wages of the preceding year on a short-form return; that, since the amount of the son's share was not determinable or paid prior to April 9, 1951, such share did not constitute income to the son in 1950, and could not be deducted by the father in said year because of the 2 1/2 month limitation on deductible payments provided by section 24(c) of the 1939 Code; and also that such share may not be deducted in any subsequent year because it accrued only in 1950. Inconsistently, and for *200 the alleged purpose of protecting the revenue, respondent accepted the son's return as filed, without determining any overassessment or overpayment by reason of his having included the 25 per cent share in his income, and having paid the tax thereon. Moreover, respondent determined additions to the son's tax for failure to declare and pay estimated tax for the year 1950 on such 25 per cent share of the profits. It is our opinion that the respondent's position should not be approved. We are convinced, after examining all the evidence and after hearing the testimony not only of the father and son but also of Judge Jones who prepared the agreement, that the business operated under the name of Louis Groh & Son was intended to be, and was, a joint venture or partnership within the meaning of section 3797(a)(2) of the Internal Revenue Code (1939); and that the distributive shares of the father and son in the 1950 profits of such venture are includible in their respective gross incomes for that year. By reason of such holding, it is unnecessary for us to consider any question respecting the father's right to deduct the son's share of the profits, or respecting the application of section *201 24(c). The Supreme Court has held that the question whether a family partnership is real depends upon "whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both." Commissioner v. Tower, 327 U.S. 280. And it has further held that, in applying such test, consideration must be given to all the facts, including "the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent * * *." Commissioner v. Culbertson, 337 U.S. 733. Thus, the question is primarily one of fact, to be determined from a consideration and weighing of all the evidence of the particular case. In the instant case, we believe there can be no reasonable doubt that Louis and Norman Groh did "really and truly intend to join together for the purpose of carrying on business"; to jointly assume the responsibilities, management, and *202 control of the operation; and to share the profits. To be sure, the agreement which Judge Jones prepared would not, in itself, appear to support this conclusion; but, while this is a factor which must be considered and weighed together with all other factors, it alone is not controlling in determining the true intent - whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Commissioner v. Culbertson, supra. The findings of fact which we have hereinabove made show that Louis Groh lived in a small community where he operated a country store, dealt in grain, and engaged in trucking. In 1949 his son Norman left college to assist in handling the business, because he was concerned about the existing one-man operation, the large amounts owed to banks, and the difficulties which would arise if anything should happen to his father. Louis had always intended that the business would eventually go to Norman, who was his only son; and after the latter had assumed many of the responsibilities and had become very dissatisfied with the existing arrangement, the father agreed to take him into the business, *203 under an arrangement whereby he would initially receive a 25 per cent interest, with such interest to be increased to 50 per cent after he had married. The written agreement which Judge Jones prepared was intended to reflect such oral arrangement; and it was executed by the parties in the belief that it was sufficient for their purposes. Neither had any thought of an income tax problem arising; and they received absolutely no income tax advice. Thereafter throughout the year 1950, the business was operated jointly by the parties under the name of Louis Groh & Son. A separate bank account of the same name was maintained, in respect of which both father and son had authority to make deposits and withdrawals; and the large number of checks issued by the son, which were produced at the hearing, show that he exercised his authority extensively. The son also supervised the employed personnel; entered into numerous contracts for the purchase and sale of grain; assumed entire responsibility for planning and building a new elevator at a cost of $150,000 to replace the obsolete structure which his father had been using; and worked full time and long hours attending to the various other responsibilities *204 of the business. Louis considered his son's services to be indispensable to the business; recognized the latter's authority to be equal to his own; made no decision without first consulting him; and regarded him to be "just as much a part of that business as I was." Similarly, Norman considered that he and his father had entered into a "joint venture," and that he was "a partner" therein. Based both on the intention of the father and son, and on their actual conduct in the operation, management, and control of the business, we hold that during 1950 they did carry on the business as a true joint venture or partnership; and that their distributive shares of the profits of such business are includible in their respective gross income for the year 1950. II. Respondent has determined that, in each of the cases here involved, additions to the tax should be imposed both under section 294(d)(1)(A) for failure to file declarations of estimated tax, and under section 294(d)(2) for substantial underestimation of estimated tax. As regards the addition to tax provided by section 294(d)(1)(A), we have hereinabove found as a fact, that the failure to file declarations was due to reasonable *205 cause and not to willful neglect. We therefore hold that, in each of the cases involved, no addition to the tax under this section should be imposed. As regards the addition to tax provided by section 294(d)(2), we find no error in the respondent's determinations. In G. E. Fuller, 20 T.C. 308, we approved the regulation (Regs. 111, section 29.294-1(b) (3)(A)), which provides that, in the event of failure to file the required declaration, the amount of the estimated tax for the purposes of the above-mentioned section is zero; and in H. R. Smith, 20 T.C. 663, we held that the additional tax provided by this section may not be avoided through a showing of reasonable cause. We here follow our decisions in the Fuller and Smith cases. Decisions will be entered under Rule 50. Footnotes
*. Freida Groh, who was a petitioner in Docket No. 51944 only by reason of having filed a joint return with her husband, died after the filing of the petition to this Court and prior to the hearing. Accordingly, the Estate of Freida Groh, Deceased. Norman D. Groh, Administrator, was substituted as one of the petitioners in said proceeding; and the caption of the proceeding was changed to reflect the substitution.↩